This Opinion is a
Precedent of the TTAB

Mailed: September 18, 2023

UNITED STATES PATENT AND TRADEMARK OFFICE

————

Trademark Trial and Appeal Board

————

*In re OSF Healthcare System*

————

Serial No. 88706809

————

Mark K. Suri of Hinshaw & Culbertson for OSF Healthcare System.

Meghan M. Reinhart, Trademark Examining Attorney, Law Office 108,
  Kathryn E. Coward, Managing Attorney.

————

Before Johnson, Acting Deputy Chief Administrative Trademark Judge, and Lynch and Larkin, Administrative Trademark Judges.

Opinion by Larkin, Administrative Trademark Judge:

OSF Healthcare System seeks registration on the Principal Register of the standard-character mark IMPACT for services ultimately identified as:

> Promoting collaboration within the public, private, academic, and faith-based communities to achieve advances in community health and wellness; Coordination in the nature of business strategic planning and business consulting services provided to public, private, academic, faith-based, community and other organizations, entities, individuals and professionals for the purpose of having them act within a coordinated ecosystem to provide services in the field of community health, mental health, physical health and wellness, in International Class 35;

Providing a website via a global computer network featuring publicly available, aggregated healthcare data in the fields of community health, physical health and wellness, mental health and substance abuse, and of care, treatment and recovery services therefor; Providing a website featuring publicly available, aggregated healthcare data in the fields of data visualization tools for community health issues, mental health, physical health, wellness, quality-of-life and social need indicators; Providing a website via a global computer network featuring publicly available, aggregated medical data regarding social needs indicators to achieve advances in community health, mental health, physical health and wellness; Healthcare and medical coordination with individuals and organizations related to improving community healthcare services; Development of community healthcare access, namely, providing publicly available, aggregated healthcare data on improving health and health awareness, in International Class 44; and

Charitable services, namely, providing case management services in the nature of coordinating preventative healthcare and wellness program services for vulnerable populations to improve access to healthcare, quality of care, and health outcomes related thereto, in International Class 45.[1]

The Trademark Examining Attorney has refused registration of Applicant's mark in all three classes under Section 2(d) of the Trademark Act, 15 U.S.C. § 1052(d), on the ground that it so resembles the stylized mark shown below

## IMPaCT

registered on the Principal Register for "Consulting services in the field of patient relationship management for healthcare workers" in International Class 35 and

---

[1] Application Serial No. 88706809 was filed on November 26, 2019 under Section 1(b) of the Trademark Act, 15 U.S.C. § 1051(b), based on Applicant's allegation of a bona fide intention to use the mark in commerce.

"Training in patient-centered, evidence-based community health worker-centered healthcare" in International Class 41,[2] as to be likely, when used in connection with the services identified in each class in the application, to cause confusion, to cause mistake, or to deceive.

When the Examining Attorney made the refusal final, Applicant appealed and requested reconsideration, which was denied. Applicant and the Examining Attorney have filed briefs.[3] We affirm the refusal to register as to Class 35 and reverse the refusal to register as to Classes 44 and 45.

## I.    Record on Appeal[4]

The record on appeal includes USPTO electronic records regarding the cited registration;[5] USPTO electronic records regarding third-party registrations of marks for various services in the medical and health care fields;[6] and third-party webpages,

---

[2] The cited Registration No. 4797962 issued on August 25, 2015 and has been maintained through the filing of a combined declaration under Sections 8 and 15 of the Trademark Act, 15 U.S.C. §§ 1058 and 1065. The registrant describes the mark as consisting of "capitalized letters 'IMP', a lower case letter 'A' and capitalized letters 'CT'."

[3] Citations in this opinion to the briefs refer to TTABVUE, the Board's online docketing system. *See New Era Cap Co. v. Pro Era, LLC*, 2020 USPQ2d 10596, at *2 n.1 (TTAB 2020). The number preceding TTABVUE corresponds to the docket entry number, and any numbers following TTABVUE refer to the page(s) of the docket entry where the cited materials appear. Applicant's brief appears at 12 TTABVUE and the Examining Attorney's brief appears at 14 TTABVUE.

[4] Citations in this opinion to the application record are to pages in the Trademark Status & Document Retrieval ("TSDR") database of the United States Patent and Trademark Office ("USPTO").

[5] December 17, 2019 Office Action at TSDR 7-9.

[6] *Id.* at TSDR 12-61; July 21, 2020 Final Office Action at TSDR 16-90.

articles, and search results regarding various services in the medical and health care fields.[7]

## II. Analysis of Refusal

"The Trademark Act prohibits registration of a mark that so resembles a registered mark as to be likely, when used on or in connection with the goods or services of the applicant, to cause confusion [or] mistake, or to deceive." *In re Charger Ventures LLC*, 64 F.4th 1375, 2023 USPQ2d 451, at *2 (Fed. Cir. 2023) (cleaned up). Our determination of the likelihood of confusion under Section 2(d) of the Trademark Act is based on an analysis of all probative facts in the record that are relevant to the likelihood of confusion factors set forth in *In re E.I. du Pont de Nemours & Co.*, 476 F.2d 1357, 177 USPQ 563, 567 (CCPA 1973) ("*DuPont*"). *Charger Ventures*, 2023 USPQ2d 451, at *4. We consider each *DuPont* factor for which there is evidence and argument. *See, e.g., In re Guild Mortg. Co.,* 912 F.3d 1376, 129 USPQ2d 1160, 1162-63 (Fed. Cir. 2019).

"In any likelihood of confusion analysis, two key considerations are the similarities between the marks and the similarities between the services." *Monster Energy Co. v. Lo*, 2023 USPQ2d 87, at *14 (TTAB 2023) (citing *Federated Foods, Inc. v. Fort Howard Paper Co.*, 544 F.2d 1098, 192 USPQ 24, 29 (CCPA 1976)), *civil action filed*, No. 5:23-cv-00549-GW-PVC (C.D. Cal. Mar. 28, 2023).

---

[7] July 21, 2020 Final Office Action at TSDR 2-15, 91-134; August 13, 2021 Response to Office Action at TSDR 5-13; September 13, 2021 Final Office Action at TSDR 2-64.

As discussed below, Applicant all but concedes that the first *DuPont* factor supports a conclusion that confusion is likely, and focuses its arguments almost exclusively on the second factor. According to Applicant, "the dispositive issue is the similarities/differences between Applicant's and Registrant's recited services and whether the relevant consumers would believe that Applicant's and Registrant's services would emanate from the same source." 12 TTABVUE 5. Applicant also argues that its customers are different from those of the cited registrant. *Id.* at 14-15.[8]

### A. Similarity or Dissimilarity of the Marks

"Under the first *DuPont* factor, we consider 'the similarity or dissimilarity of the marks in their entireties as to appearance, sound, connotation and commercial impression.'" *In re Embiid*, 2021 USPQ2d 577, at *11 (TTAB 2021) (quoting *Palm Bay Imps., Inc. v. Veuve Clicquot Ponsardin Maison Fondee En 1772*, 396 F.3d 1369, 73 USPQ2d 1689, 1692 (Fed. Cir. 2005)). "Apparently conceding the issue, Applicant did not address [this *DuPont* factor] in its brief, so we offer only a brief explanation of our conclusion." *In re Morinaga Nyugyo K.K.*, 120 USPQ2d 1738, 1740 (TTAB 2016).

---

[8] Applicant states in the "Conclusion" section in its brief that "the cited mark is not famous; and many similar marks for similar services already exist," 12 TTABVUE 15, which statements implicate the fifth and sixth *DuPont* factors, the "fame of the prior mark (sales, advertising, length of use)," and the "number and nature of similar marks in use on similar goods," respectively. *DuPont*, 177 USPQ at 567. Applicant's "assertions are unsupported by sworn statements or other evidence, and 'attorney argument is no substitute for evidence.'" *In re OEP Enters., Inc.*, 2019 USPQ2d 309323, at *14 (TTAB 2019) (quoting *Cai v. Diamond Hong, Inc.*, 901 F.3d 1367, 127 USPQ2d 1797, 1799 (Fed. Cir. 2018) (internal quotation omitted)). Because Applicant offers no evidence in support of these statements, we have not considered these factors in our decision. *Guild Mortg.,* 129 USPQ2d at 1162-63.

The involved marks IMPACT in standard characters and IMPACT in the stylized presentation shown again below

**IMPaCT**

are identical in sound and connotation and commercial impression. They are also identical in appearance when we take into account that Applicant's standard-character mark "may be used in 'any particular font style, size, or color'," including "the same font, size and color as the literal portions of [the cited] mark." *In re Aquitaine Wine USA, LLC*, 126 USPQ2d 1181, 1186 (TTAB 2018) (quoting Trademark Rule 2.52(a), 37 C.F.R. § 2.52(a)); *see also In re Viterra Inc.*, 671 F.3d 1358, 101 USPQ2d 1905, 1909 (Fed. Cir. 2012). Because the marks are identical in all means of comparison, the first *DuPont* factor "weighs heavily in favor of a likelihood of confusion because identicality of the marks is likely to lead to the assumption that there is a common source" for the services identified in the application and cited registration. *Tiger Lily Ventures Ltd. v. Barclays Cap. Inc.*, 35 F.4th 1352, 2022 USPQ2d 513, at \*8 (Fed. Cir. 2022).

### B. Similarity or Dissimilarity of the Services, Channels of Trade, and Classes of Consumers

In analyzing the services, the Board "'considers [t]he similarity or dissimilarity and nature of the . . . services as described in an application or registration . . . .'" *Embiid*, 2021 USPQ2d 577, at \*22 (quoting *In re Detroit Athletic Co.*, 903 F.3d 1297, 128 USPQ2d 1047, 1051 (Fed. Cir. 2018) (quoting *DuPont*, 177 USPQ at 567)). The "services need not be identical or even competitive to find a likelihood of confusion."

*In re Country Oven, Inc.*, 2019 USPQ2d 443903, at \*4 (TTAB 2019) (citations omitted). "They need only be 'related in some manner and/or if the circumstances surrounding their marketing are such that they could give rise to the mistaken belief that [they] emanate from the same source." *Id.* (quoting *Coach Servs., Inc. v. Triumph Learning LLC*, 668 F.3d 1356, 101 USPQ2d 1713, 1722 (Fed. Cir 2012) (internal quotation omitted)). In assessing the relatedness of the services, we are mindful that "the degree of 'relatedness' must be viewed in the context of all the factors" and that "even when the goods or services are not competitive or intrinsically related, the use of identical marks can lead to the assumption that there is a common source." *In re Shell Oil Co.*, 992 F.2d 1204, 26 USPQ2d 1687, 1689 (Fed. Cir. 1993) (citing *Philip Morris Inc. v. K2 Corp.*, 555 F.2d 816, 194 USPQ 81, 82 (CCPA 1977)).

"Evidence of relatedness may include news articles or evidence from computer databases showing that the relevant goods [or services] are used together or used by the same purchasers; advertisements showing that the relevant goods [or services] are advertised together or sold by the same manufacturer or dealer; or copies of prior use-based registrations of the same mark for both applicant's goods [or services] and the goods [or services] listed in the cited registration." *Embiid*, 2021 USPQ2d 577, at \*22-23 (quoting *In re Ox Paperboard, LLC,* 2020 USPQ2d 10878, at \*5 (TTAB 2020)). In addition, "[t]he application and registration themselves may provide evidence of the relationship between the services." *Monster Energy*, 2023 USPQ2d 87, at \*14 (citations omitted).

"Because each class in Applicant's multi-class application is, in effect, a separate application, we consider each class separately, and determine whether [the Examining Attorney] has shown a likelihood of confusion with respect to each." *N. Face Apparel Corp. v. Sanyang Indus. Co.*, 116 USPQ2d 1217, 1228 (TTAB 2015). On the appeal of a refusal to register directed to all classes in a multi-class application such as this one, examining attorneys and applicants should facilitate the Board's review by discussing the evidence of relatedness on a class-by-class basis.

At the same time, the "Examining Attorney need not prove, and we need not find, similarity as to each [service] listed in the description of [services]" in each class in the application. *In re St. Julian Wine Co.*, 2020 USPQ2d 10595, at *3-4 (TTAB 2020). "'[I]t is sufficient for finding a likelihood of confusion if relatedness is established for any [service] encompassed by the identification of [services] within a particular class in the application.'" *Id.*, at *4 (quoting *In re Aquamar, Inc.*, 115 USPQ2d 1122, 1126 n.5 (TTAB 2015)); *see also Tuxedo Monopoly, Inc. v. Gen. Mills Fun Grp.*, 648 F.2d 1335, 209 USPQ 986, 988 (CCPA 1981).

We "begin with the identifications of . . . services in the registration and application under consideration." *Country Oven*, 2019 USPQ2d 443903, at *5. The cited registration covers "Consulting services in the field of patient relationship management for healthcare workers" in Class 35 and "Training in patient-centered, evidence-based community health worker-centered healthcare" in Class 41. Applicant acknowledges that the "full scope of the Applicant's and Registrant's recited services must be examined to determine if consumers would expect them to

emanate from the same source." 12 TTABVUE 9. In that regard, we must construe the services identified in the cited registration as broadly as reasonably possible "to include all [services] of the nature and type described therein," *In re Solid State Design Inc.*, 125 USPQ2d 1409, 1413 (TTAB 2018) (quoting *In re Jump Designs, LLC*, 80 USPQ2d 1370, 1374 (TTAB 2006)), and we must resolve any ambiguities regarding their coverage in favor of the cited registrant "given the presumptions afforded the registration under Section 7(b)" of the Trademark Act. *In re C.H. Hanson Co.*, 116 USPQ2d 1351, 1355 (TTAB 2015) (citing 15 U.S.C. § 1057(b)). As Applicant acknowledges, 12 TTABVUE 9, we must also give the services identified in the application their full scope in our analysis of the second *DuPont* factor. *Country Oven*, 2019 USPQ2d 443903, at *5-6.

Applicant's basic position with respect to all three classes in its application is that its services "do not include training or educational services":

> Applicant provides "publicly available, aggregated data," not private, patient-specific information, as does Registrant. By gathering and making this public data available in a central, web[-]based location, Applicant enables its consumers to perform analytics on such data to glean insights that they may use to improve the lives of people in the communities Applicant serves. Registrant's services are not related to this.

12 TTABVUE 5-6.

Applicant further argues generally that its services "are a community-based approach for better population health that strategically pinpoints and improves pockets of need for community health and community engagement" and that through its website, it provides "[m]apping and data visualization tools," a "dashboard of over

100 health and quality-of-life indicators," a "[p]romising practices (2,000+) database of evidence-based programs," a "SocioNeeds Index to pinpoint and prioritize the most at-risk populations," "[]local resources," "[c]ommunity engagement and collaboration tools, such as an event calendar, news, polls, and the like," and "[l]inks to conferences, events, community initiatives, and the like." *Id.* at 6.

According to Applicant, its website "features information in the fields of physical health, mental health and substance abuse and of care, treatment and recovery services therefore [sic]" and "allows public, private, academic, faith-based, community and other organizations, entities, individuals and professionals to act within a coordinated ecosystem to provide services in the field of community health, mental health, physical health and wellness." *Id.* at 7. Applicant argues that to further this "coordinated ecosystem," its "services act as a connector to other entities, such as public health agencies, YMCA/YWCAs and food pantries, that will provide educational, charitable and additional services," *id.* at 6, and that the cited registrant's "services are far different than those provided by Applicant and relevant consumers would not expect Applicant's and Registrant's services to emanate from the same source." *Id.* at 8.

Applicant also argues that its services of "promoting collaboration . . . and/or providing . . . public data" are not related to the cited registrant's training services, *id.* at 13, because "[t]raining services are educational services" and Applicant's services "clearly do not include educational or training services." *Id.* at 14. According to Applicant, "[s]imply having a website that makes available public aggregated data

for analysis or promoting collaboration and coordination among various entities to improve healthcare does not constitute training services." *Id.*

Finally, Applicant argues that

> [b]ecause Applicant's services are not related to Registrant's services, the consumers for the two parties' services are very different. Consumers of Applicant's services will be looking for trends in community health, trends that may be discovered by using the public aggregated data found on Applicant's website. Applicant's charitable services also relate to community-wide healthcare, not to individual patient related services. Consumers of Applicant's services will look to Applicant to promote collaboration and coordination among them and a variety of community organizations. Consumers of Registrant's services, on the other hand, will seek Registrant's services to train such consumers or to engage Registrant in consulting for said consumers in the field of patient relationship management for healthcare workers. Consumers of Registrant's services will be trying to improve their relationships with individual patients, and will not be concerned with aggregated publicly available data. Consumers of Applicant's services will not look to Applicant to provide any services related to individual patients.

*Id.* at 14-15.

The Examining Attorney responds generally that Applicant's services "overlap with and/or are related to the services identified in the cited registration in that they are all healthcare related services that are likely to emanate from the same source and/or be provided, marketed and/or used in connection with one another." 14 TTABVUE 9. The Examining Attorney first argues that certain of Applicant's Class 35 services are related to the registrant's Class 35 services on the face of the involved identifications:

> [A]pplicant's services are broad enough to encompass the following, which overlap with registrant's Class 35 services: "Coordination in the nature of business strategic planning and business **consulting** services **in the field of patient relationship management** provided to public, private, academic, faith-based, community and other organizations, entities, individuals **in the nature of healthcare workers** and professionals for the purpose of having them act within a coordinated ecosystem to provide services in the field of community health, mental health, physical health and wellness."

*Id.* (emphasis in bold here in italics in the original).

The Examining Attorney then argues that 10 webpages in the record "demonstrate that applicant's and registrant's services do, in fact, emanate from the same sources and/or are provided, marketed and/or used together," *id.* at 10, and that 10 of the 25 third-party registrations in the record do so as well. *Id.* at 10-12.

The Examining Attorney rejects Applicant's arguments regarding the nature of its services and their difference from those identified in the cited registration because "there is nothing in registrant's identification of services that limits it to providing private, patient specific information in the context of its consulting services" and "a consumer of registrant's consulting services may want publicly available, aggregated healthcare/medical data, such as the data featured on applicant's websites, when figuring out what might work best for the consumer's patient relationship management strategies." *Id.* at 13.

The Examining Attorney also rejects Applicant's arguments that the cited registrant's services "are limited to 'patient relationship management and training'" and thus are unrelated to Applicant's services because "there is no restriction in registrant's training services that prevent it [sic] from being related to subject

matters other than 'patient relationship management for healthcare workers'" and that "[w]hile that language appears in registrant's Class 35 consulting services entry, it does not appear in the Class 41 training services entry which reads as follows: 'Training in patient-centered, evidence-based community health worker-centered healthcare.'" *Id*. According to the Examining Attorney, "that training can encompass a variety of subject matters that relate to such healthcare including case management services such as the ones offered by applicant in Class 45." *Id*.

### 1. Class 35

The Class 35 portion of the application covers two services. The Examining Attorney focuses on the second service, which is identified as:

> Coordination in the nature of business strategic planning and business consulting services provided to public, private, academic, faith-based, community and other organizations, entities, individuals and professionals for the purpose of having them act within a coordinated ecosystem to provide services in the field of community health, mental health, physical health and wellness.

*Id*. at 9.[9] For the reasons discussed below, we agree with the Examining Attorney that on the face of the involved identifications, the "business consulting services" in

---

[9] The phrases "business strategic planning" and "business consulting services" are preceded by the preamble "Coordination in the nature of . . . ." As noted in Section 1402.03(a) of the TRADEMARK MANUAL OF EXAMINING PROCEDURE ("TMEP") (July 2022), the "terms 'namely,' 'consisting of,' 'particularly,' 'in particular,' and 'in the nature of' are definite and are preferred to set forth an identification that requires greater particularity," and the "examining attorney will require that vague terminology be replaced by these terms . . . ." TMEP § 1402.03(a). "The goods or services listed after [the phrase] 'in the nature of,' . . . must further define the introductory wording that precedes [the phrase] 'in the nature of,' . . . using definite terms within the scope of the introductory wording." *Id*. We conclude that the language "business consulting services" further defines the introductory wording "coordination" but is not limited by it.

the application encompass the Class 35 "consulting services in the field of patient relationship management for healthcare workers" in the cited registration, and we thus need not discuss the Examining Attorney's Internet and registration evidence regarding relatedness in Class 35.

Applicant's "business consulting services provided to public, private, academic, faith-based, community and other organizations, entities, individuals and professionals for the purpose of having them act within a coordinated ecosystem to provide services in the field of community health, mental health, physical health and wellness" have three elements: (1) their nature ("business consulting services"), (2) their consumers or recipients ("public, private, academic, faith-based, community and other organizations, entities, individuals and professionals"), and (3) their purpose ("having them act within a coordinated ecosystem to provide services in the field of community health, mental health, physical health and wellness"). The "consulting services in the field of patient relationship management for healthcare workers" in the cited registration similarly have two elements: (1) their nature ("consulting services in the field of patient relationship management") and (2) their consumers or recipients ("healthcare workers").

Applicant's "business consulting services" encompass the cited registration's Class 35 "consulting services in the field of patient relationship management for healthcare workers" because there is no limitation on the "business consulting services" in the application excluding "the field of patient relationship management." As a result,

Applicant's services may include consultation services directed to the business of patient relationship management.

The "healthcare workers" to whom the "consulting services in the field of patient relationship management for healthcare workers" in the cited registration are provided could be, or work for, a "business" for purposes of the "business consulting services" identified within the application. They fall comfortably within the "individuals and professionals" who are among the persons to whom Applicant's "business consulting services" are provided.

Finally, the identification of the "consulting services in the field of patient relationship management for healthcare workers" in the cited registration is broad enough to include providing those services "for the purpose of having [healthcare workers] act within a coordinated ecosystem to provide services in the field of community health, mental health, physical health and wellness."

The Class 35 services in the application identified as "Coordination in the nature of business strategic planning and business consulting services provided to public, private, academic, faith-based, community and other organizations, entities, individuals and professionals for the purpose of having them act within a coordinated ecosystem to provide services in the field of community health, mental health, physical health and wellness" are thus legally identical to the Class 35 services identified in the cited registration. The second *DuPont* factor strongly supports a conclusion that confusion is likely as to Class 35 in the application. *In re Medline Indus., Inc.*, 2020 USPQ2d 10237, at *4 (TTAB 2020).

"Because the [Class 35] services described in the application and the [cited] registration are legally identical in part, we must presume that the channels of trade and classes of purchasers are the same as to those legally identical services." *Monster Energy*, 2023 USPQ2d 87, at \*17 (citing *Viterra*, 101 USPQ2d at 1908). The third *DuPont* factor thus also strongly supports a conclusion that confusion is likely as to Class 35 in the application. *Medline Indus.*, 2020 USPQ2d 10237, at \*4.

### 2. Class 44

The Class 44 portion of the application covers multiple services identified as:

> "Providing a website via a global computer network featuring publicly available, aggregated healthcare data in the fields of community health, physical health and wellness, mental health and substance abuse, and of care, treatment and recovery services therefor; Providing a website featuring publicly available, aggregated healthcare data in the fields of data visualization tools for community health issues, mental health, physical health, wellness, quality-of-life and social need indicators; Providing a website via a global computer network featuring publicly available, aggregated medical data regarding social needs indicators to achieve advances in community health, mental health, physical health and wellness; Healthcare and medical coordination with individuals and organizations related to improving community healthcare services; Development of community healthcare access, namely, providing publicly available, aggregated healthcare data on improving health and health awareness."

The first three services expressly involve providing an Internet website "featuring publicly available, aggregated healthcare data" in various fields and for various purposes, while the last two services involve "healthcare and medical coordination" and "providing publicly available, aggregated healthcare data on improving health and health awareness," without limitation to an Internet website. As discussed below,

the Examining Attorney focuses solely on the Class 44 services identified as "Healthcare and medical coordination with individuals and organizations related to improving community healthcare services."

The Examining Attorney does not argue that Applicant's Class 44 services are related to the services identified in the cited registration on the face of the identifications, but instead relies on third-party webpages and registrations to establish relatedness.

### a.    Third-Party Webpages

With respect to Internet evidence, in determining exactly what services are offered through the respective websites, we acknowledge that services may not be explicitly described at all, or may be described in colloquial language that does not track the technical language of acceptable identifications of goods and services in applications and registrations, including those involved here. *See* TMEP § 1402 (discussing identifications of goods and services in applications). In such instances, we must determine the nature of the services that are offered, and decide whether they fall within the full scope of the language in the involved identifications. *Cf. In re Dare Foods, Inc.*, 2022 USPQ2d 291, at *6 (TTAB 2022) (construing smoked salmon, shellfish, and caviar cream spread displayed on a website as "falling within the ambit of Applicant's 'snack food dips'.").

The Examining Attorney cites the following websites that she claims specifically show that both Applicant's Class 44 services identified as "healthcare and medical coordination with individuals and organizations related to improving community healthcare services," and what she describes as "healthcare/medical training,"

apparently a reference to the services identified in the cited registration as "training in patient-centered, evidence-based community health worker-centered healthcare," "emanate from the same source and/or are provided, marketed and/or used together," 14 TTABVUE 9:

- kaiserpermanente.org and medschool.kp.org, *id.*;[10]

- mayoclinic.org, *id.*;[11]

- nachc.org, *id.* at 10;[12]

- rwjbh.org, *id.*;[13]

- rwjms.rutgers.edu, *id.* and;[14]

- ruralhealth.und.edu. *Id.*[15]

The cited Kaiser Permanente webpages contain a section captioned "Community Health," which discusses Kaiser Permanente's commitment to "advancing health through the spread of best practices that embrace innovation and technology," states that Kaiser Permanente "works in partnership with our communities, using our collective knowledge to identify and implement creative solutions to difficult community health problems," and reflects a particular commitment to mental health and the country's aging population. The webpages also discuss Kaiser Permanente's

---

[10] September 13, 2021 Final Office Action at TSDR 2-12.

[11] *Id.* at TSDR 13-18.

[12] *Id.* at TSDR 30-35.

[13] *Id.* at TSDR 36-42.

[14] *Id.* at TSDR 43-45.

[15] *Id.* at TSDR 52-65.

Bernard J. Tyson School of Medicine's training of medical students to serve a wide range of patients and populations.[16]

The cited first page from the website of the Mayo Clinic states that the Clinic "is committed to working collaboratively with local partners to regularly assess and address the health needs within its local communities, as well as advance population health locally to globally through integrated clinical practice, education and research" and that the Clinic works "with hundreds of community partners on collective efforts to improve the quality of life, health and well-being of all in our communities."[17] The webpages also discuss the Mayo Clinic Care Network, which involves both patients and clinicians.[18]

The cited first page from the website of the Center for Community Health Innovation ("CCHI") at nachc.org states that the CCHI "will work to identify, support and replicate groundbreaking approaches to practice innovation, workforce development, and collaborative arrangements in the delivery of community-based health care" and that the CCHI's goal "is to prepare Community Health Centers for sustainable operational and clinical success, building on their unique 50-plus-year history and commitment to equity and access."[19]

The cited pages from the website of RWJBarnabas Health at rwjbh.org discuss a "Community Health Need Assessment" based on "a rigorous review of its communities' health needs in partnership with other hospitals, other health

---

[16] *Id.* at TSDR 2-10.
[17] *Id.* at TSDR 13.
[18] *Id.* at TSDR 15-17.
[19] *Id.* at TSDR 30.

providers, public health experts and community stakeholders," which "identified areas of prioritized need in which our hospitals have developed action plans to address these priorities."[20]

The cited pages from the website of the Robert Wood Johnson Medical School at Rutgers University at rwjms.rutgers.edu discuss (1) the "Homeless and Indigent Population Health Outreach Project," a "program established in 1992 by the medical students as a student-directed community service and learning program" through which medical students "provide community outreach, health promotion, preventative education and clinical services to the underserved populations in New Brunswick and Middlesex County" in New Jersey, (2) the Eric B. Chandler Health Center, operated by the Medical School, which is described as "a comprehensive, family oriented community health center dedicated to the provision of high quality ambulatory care services to low income and medically indigent residents of the Great New Brunswick community," and (3) the Promise Clinic, which provides health services to indigent patients.[21]

Finally, the first cited page from the website of the Center for Rural Health states that the Center "works with rural and tribal communities to build responsive and sustainable health systems and strong rural health organizations." The remainder of the pages from the website discuss various activities in furtherance of that goal, including grant writing support, attracting health care professionals, community

---

[20] *Id.* at TSDR 36-37.

[21] *Id.* at TSDR 43-45.

health planning and development, topical presentations, program evaluations, and healthcare facility support, and identify multiple current projects, as well as the Dakota Conferences on Rural and Public Health directed to healthcare professionals, educators, and students, and a Community Health Needs Assessment program, which is identified as a "systematic process involving the community to identify and analyze community health needs."[22]

As noted above, the Examining Attorney argues that these websites show that Applicant's Class 44 services are related to what the Examining Attorney describes generally as "healthcare/medical training." That is not the issue. We must determine whether Applicant's Class 44 services are related to the specific "training in patient-centered, evidence-based community health worker-centered healthcare" identified in the cited registration. The Examining Attorney effectively broadened and generalized that identification of services and submitted evidence addressed to the broader identification, not the actual one.

Only the websites of Rutgers University's medical school and Kaiser Permanent's medical school reference any form of healthcare or medical training.[23] To the extent that we can reasonably construe the training offered by these medical schools, as described on the portions of their websites in the record, as falling within the ambit of the "training in patient-centered, evidence-based community health worker-

---

[22] *Id.* at TSDR 52-56, 62-64.

[23] The Center for Rural Health website indicates that the Center is affiliated with the University of North Dakota School of Medicine & Health Sciences, *id.* at TSDR 52, but does not discuss any training that is offered by the School of Medicine.

centered healthcare" services identified in the cited registration, only Kaiser Permanente's medical school also appears to offer services that fall within the ambit of Applicant's Class 44 services of "healthcare and medical coordination with individuals and organizations related to improving community healthcare services."

### b.    Third-Party Registrations

When we consider third-party registrations, "[j]ust as we must consider the full scope of the goods and services as set forth in the application and registration under consideration, we must consider the full scope of the goods and services described in a third-party registration." *Country Oven*, 2019 USPQ2d 443903, at *9.

The Examining Attorney cites 10 of the 25 third-party registrations in the record, 14 TTABVUE 10-12, but none of them, and none of the other 15 third-party registrations in the record, covers the Class 44 services identified as "healthcare and medical coordination with individuals and organizations related to improving community healthcare services." In addition, none of the Class 44 identifications in the registrations can reasonably be read as encompassing "healthcare and medical coordination with individuals and organizations related to improving community healthcare services" when given their full scope.

In sum, we find that the record contains, at most, one relevant third-party website, and no relevant third-party registrations, as support for the Examining Attorney's argument that Applicant's Class 44 services commonly emanate from the same source as either of the services identified in the cited registration. We find that the evidence does not establish the relatedness of Applicant's Class 44 services and the services in Class 35 or Class 41 in the cited registration, and also does not establish that the

channels of trade or classes of consumers for these services overlap. Accordingly, we find that the *DuPont* factors regarding the similarity or dissimilarity of the services, channels of trade, and classes of consumers support a conclusion that confusion is not likely as to Class 44 in the application.

### 3. Class 45

Applicant's Class 45 services are "Charitable services, namely, providing case management services in the nature of coordinating preventative healthcare and wellness program services for vulnerable populations to improve access to healthcare, quality of care, and health outcomes related thereto." Like Applicant's Class 35 services, its Class 45 services have three elements: (1) their "charitable" nature ("providing case management services in the nature of coordinating preventative healthcare and wellness program services"), (2) their consumers or recipients ("vulnerable populations"), and (3) their purpose ("to improve access to healthcare, quality of care, and health outcomes related thereto").

The Examining Attorney focuses on the registrant's Class 41 "training in patient-centered, evidence-based community health worker-centered healthcare" services and notes that, contrary to "[A]pplicant's assertions that the registrant's services are limited to 'patient relationship management and training,'" there is no restriction in those services that prevents them "from being related to subject matter other than 'patient relationship management for healthcare workers.'" 14 TTABVUE 13. According to the Examining Attorney, those Class 41 services "can encompass a variety of subject matters that relate to such healthcare including case management services such as the ones offered by [A]pplicant in Class 45." *Id.*

We agree with the Examining Attorney's analysis of the full scope of the registrant's Class 41 training services, but their coverage does not make them related to Applicant's Class 45 services on the face of the respective identifications. The registrant's Class 41 services are training services for providers of health care, which we conclude may include training in "case management services." Applicant's Class 45 services, however, are a particular species of the "case management services" themselves, "in the nature of coordinating preventative healthcare and wellness program services." The registrant's Class 41 services encompass training healthcare providers in "case management services," while Applicant's Class 45 services involve rendition of certain "case management services" to "vulnerable populations." Accordingly, the Examining Attorney must prove the relatedness of Applicant's Class 45 services to the registrant's Class 41 or Class 35 services by other record evidence, which we discuss below.

### a.    Third-Party Webpages

The Examining Attorney cites the following websites that she claims specifically show that both Applicant's Class 45 "case management services in the nature of coordinating preventative healthcare and wellness program services for vulnerable populations" and the Class 41 services in the cited registration "emanate from the same source and/or are provided, marketed and/or used together," 14 TTABVUE 9:

- medstargeorgetown.com, *id.*;[24]

---

[24] July 21, 2020 Final Office Action at TSDR 9-15, 98-101.

- kaiserpermanente.org and medschool.kp.org, *id.*;[25]

- nachc.org, *id.* at 10;[26]

- rwjms.rutgers.edu, *id.*;[27] and

- ruralhealth.und.edu. *Id.*[28]

We have described the contents of the webpages from the last four of these websites in our analysis of Class 44 above.

The cited MedStar Georgetown University Hospital webpages discuss multiple subjects, including preventing blood clots, the Hospital's programs to develop its residents, fellows, and faculty as leaders in medicine, participation in a federal drug savings program to assist "hospitals serving vulnerable communities expand access to prescription drugs and support essential services for their communities," and the Hospital's commitment to, and various programs involving, access to medical care for vulnerable populations.[29]

These five sets of webpages show that medical schools, community health centers, and hospitals commonly offer various services and programs directed to what Applicant's Class 45 identification of services describes as "vulnerable populations," and that these services and programs, like Applicant's Class 45 services, have as their objective "improv[ing] access to healthcare, quality of care, and health outcomes

---

[25] September 13, 2021 Final Office Action at TSDR 2-12.

[26] *Id.* at TSDR 30-35.

[27] *Id.* at TSDR 43-45.

[28] *Id.* at TSDR 52-65.

[29] July 21, 2020 Final Office Action at TSDR 9-15, 98-101.

related thereto." But even if the services or programs reflected on these websites could reasonably be construed as offering the service of "coordinating preventative healthcare and wellness program services for vulnerable populations," as the Examining Attorney argues, none of the institutions describes its services or programs as involving any sort of "case management services."

Moreover, even if these webpages could reasonably be construed as reflecting the provision of Applicant's Class 45 services in their entirety, the Examining Attorney again argues only that they also provide "healthcare/medical training" generally, not the registrant's Class 41 "training in patient-centered, evidence-based community health worker-centered healthcare." As discussed above, only the websites of Rutgers University's medical school and Kaiser Permanent's medical school could be construed as providing such training to medical students.[30]

### b. Third-Party Registrations

None of the third-party registrations in the record specifically covers the registrant's Class 41 "training in patient-centered, evidence-based community health worker-centered healthcare" services, but three third-party registrations cover Class 41 services identified as "medical training and teaching;"[31] and four others cover Class 41 services identified as (1) "providing seminars, training classes and workshops in the field of health and healthcare management and distributing course

---

[30] The "healthcare/medical training" reflected on the website of Georgetown Hospital pertains to the training of physicians, residents, fellows, and school faculty for leadership roles in the field of medicine.

[31] December 17, 2019 Office Action at TSDR 33-35, 39-42; July 21, 2020 Final Office Action at TSDR 65-67.

materials in connection therewith;"[32] (2) "providing training services through workshops, seminars, symposiums, on-site visits, and face-to-face training to community health centers and related entities in the field of healthcare;"[33] (3) "providing online electronic newsletters delivered by email and interactive educational content in the nature of interactive online training services in the fields of medicine and healthcare;"[34] and (4) "providing courses, training and seminars for the education of health services personnel, namely, doctors, nurses, pharmacists, physician assistants, radiology techs and other health professionals."[35] Giving the identifications of services in these seven registrations their full scope, we conclude that they encompass "training in patient-centered, evidence-based community health worker-centered healthcare."

We next consider whether these seven registrations also cover Applicant's Class 45 services. Five of them do not include Class 45 at all,[36] and the Examining Attorney has not pointed to any specific services in other classes in these registrations that we should deem equivalent or related to the specific involved case management services on the face of the identifications.[37] A sixth registration covers services in Class 45,

---

[32] July 21, 2020 Final Office Action at TSDR 19-26.

[33] *Id.* at TSDR 58-61.

[34] *Id.* at TSDR 68-70.

[35] *Id.* at TSDR 71-73.

[36] December 17, 2019 Office Action at TSDR 33-35, 39-42; July 21, 2020 Final Office Action at TSDR 65-67, 68-70, 71-73.

[37] The Examining Attorney discusses two of these registrations, 14 TTABVUE 11-12 (citing December 17, 2019 Office Action at TSDR 39-42; July 21, 2020 Final Office Action at TSDR 65-67), but she does not cite any services identified in them that are related to Applicant's Class 45 services on the face of the identifications.

but not any sort of "case management services," or any other services that could encompass such services when given their full scope.[38] The remaining registration covers "case management services, namely, coordination of patient post-discharge and between different care settings,"[39] but the Examining Attorney does not argue that these services encompass or are related to Applicant's case management services "in the nature of coordinating preventative healthcare and wellness program services for vulnerable populations to improve access to healthcare, quality of care, and health outcomes related thereto," 14 TTABVUE 10-12, and they do not appear to be related on their face to Applicant's Class 45 services because the services identified in the registration involve post-patient discharge case management services, while Applicant's services involve "coordinating preventative healthcare and wellness program services."

For completeness, we will also discuss the registrant's Class 35 "consulting services in the field of patient relationship management for healthcare workers." Sixteen of the third-party registrations in the record cover functionally equivalent services identified as (1) "consulting services in the field of patient relationship management for healthcare providers," (2) "consulting services in the field of patient relationship management," or (3) "business consulting services in the field of physician and patient relationship management for the purpose of enabling health plans, hospitals, healthcare providers, physicians and other providers of healthcare

---

[38] July 21, 2020 Final Office Action at TSDR 58-61.

[39] *Id.* at TSDR 19-26.

to monitor and manage patient health and healthcare and improve clinical effectiveness all for business purposes."[40]

Thirteen of these registrations, however, do not contain Class 45 at all,[41] and the Examining Attorney has again not pointed to any equivalent identifications in other classes.[42] The three registrations that do contain Class 45 services cover (1) "providing case management services, namely, coordinating legal, physical, social and psychological services for persons with diseases, illnesses, and medical conditions,"[43] (2) "managed care services, namely, providing case management services in the nature of the coordination of necessary medical services,"[44] and (3) "providing patient advocate and case management services, namely, coordinating the procurement and administration of medication."[45] None of these identifications encompasses Applicant's case management services "in the nature of coordinating preventative healthcare and wellness program services for vulnerable populations to improve access to healthcare, quality of care, and health outcomes related thereto."

---

[40] December 17, 2019 Office Action at TSDR 29-32, 33-35, 36-38, 39-42, 43-45, 46-49, 54-56, 57-61; July 21, 2020 Final Office Action at TSDR 16-18, 27-35, 47-49, 54-57, 62-64, 74-76, 77-82, 87-90.

[41] December 17, 2019 Office Action at TSDR 29-32, 33-35, 36-38, 39-42, 43-45, 46-49, 54-56; July 21, 2020 Final Office Action at TSDR 27-35, 47-49, 54-57, 74-76, 77-82, 87-90.

[42] The Examining Attorney discusses six of these registrations, 14 TTABVUE 10-12 (citing December 17, 2019 Office Action at TSDR 36-38, 39-42, 43-45, 46-49, 54-56; July 21, 2020 Final Office Action at TSDR 47-49), but she again does not cite any services identified in these registrations that are related to Applicant's Class 45 services on the face of the identifications.

[43] December 17, 2019 Office Action at TSDR 57-61.

[44] July 21, 2020 Final Office Action at TSDR 16-18.

[45] *Id.* at TSDR 62-64.

In sum, the record contains, at most, two relevant third-party websites, and no relevant third-party registrations, as support for the Examining Attorney's argument that Applicant's Class 45 services commonly emanate from the same source as the services identified in the cited registration. We recognize that in cases, such as this one, which involve identical marks, the services need not be shown to be closely related for there to be a likelihood of confusion, but we find that the evidence in the record here is insufficient to establish that Applicant's Class 45 services and the services in Class 35 or Class 41 in the cited registration are related. We also find that the evidence is insufficient to show an overlap in channels of trade or classes of consumers for these services. Accordingly, we find that the *DuPont* factors regarding the similarity or dissimilarity of the services, channels of trade, and classes of consumers support a conclusion that confusion is not likely as to Class 45 in the application.

### C.    Summary of the *DuPont* Factors

The marks are identical, which strongly supports a conclusion that confusion is likely in all three classes because identicality reduces the degree of similarity between the services required for confusion to be likely. As to the similarity of the services, the Examining Attorney showed that the Class 35 services identified in the application as "business consulting services provided to public, private, academic, faith-based, community and other organizations, entities, individuals and professionals for the purpose of having them act within a coordinated ecosystem to provide services in the field of community health, mental health, physical health and

wellness" and the Class 35 services identified in the cited registration are legally identical. Given the identity of the services, the channels of trade and classes of consumers for the Class 35 services are presumed to overlap. Thus, all of the *DuPont* factors bearing on our analysis with respect to Class 35 weigh in favor of a conclusion that confusion is likely, and we conclude that there is a likelihood of confusion as to Class 35 in its entirety.

With respect to Classes 44 and 45, however, the evidence made of record by the Examining Attorney is insufficient to show that the Class 44 and Class 45 services identified in the application are related to either of the services identified in the cited registration. Accordingly, we conclude that confusion is unlikely as to the services in those classes notwithstanding the identity of the marks.

**Decision**: The refusal to register is affirmed as to Class 35, and reversed as to Classes 44 and 45. The services in Class 35 will be deleted from the application, which will proceed with the remaining services in Classes 44 and 45.